Sealed

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

Case No.:

UNITED STATES OF AMERICA, *ex rel.*
KENNETH F. MORSE,

BRINGING THIS ACTION ON BEHALF
OF THE UNITED STATES OF AMERICA,

     Plaintiff and Relator,

v.

SKINCURE ONCOLOGY, LLC,
TRU-SKIN FRANCHISE DEVELOPMENT, LLC
d/b/a TRU-SKIN DERMATOLOGY, and
JOHN DOE 1-50,

     Defendants.

_____/

**18-21111**

**FILED IN CAMERA AND**
**UNDER SEAL PURSUANT**
**TO 31 U.S.C. 3730(b)(2)**

**DO NOT SERVE**



CIV-COOKE /GOODMAN

## COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

### I. INTRODUCTION AND SUMMARY OF DEFENDANTS' FALSE CLAIMS

1.    Qui Tam Relator Kenneth Morse brings this action on behalf of the United States of America and himself to recover damages and penalties arising from violations of the Federal Civil False Claims Act, 31 U.S.C. §3729 *et seq.* ("FCA"), against Defendants Tru-Skin Dermatology and SkinCure Oncology, LLC (hereinafter collectively referred to as the "Defendants"). The violations arise out of false claims for payment made to Medicare.

2.    This Complaint details illegal conduct through which Defendants caused the submission of false claims in violation of the FCA. Relator's allegations relate to the fraudulent medical coding and billing related to superficial radiation therapy in the context of dermatology.

3.      The violations alleged herein resulted in the receipt of government funds many times in excess of the proper amount.   Indeed, in many instances, the Defendants billed Medicare in excess of four times the proper allowable amount per patient.

4.      Based upon the Defendants' false claims, the government has incurred and continues to incur damages to be in excess of $80,000,000 per year, and $160,000,000 over the past two years.

## II. JURISDICTION AND VENUE

5.      This action arises under the federal False Claims Act, 31 U.S.C. §3729, *et seq.*

6.      Subject-matter jurisdiction is proper in this Court pursuant to 31 U.S.C. 3732(a) and 28 U.S.C. § 1331.   The Defendants are subject to personal jurisdiction in this district because one or more of the Defendants transact business in this district.

7.      Venue lies in this district pursuant to 28 U.S.C. § 1391(b) and (c) and 31 U.S.C. § 3732(a) because one or more of the Defendants operate and transact business within this district. 31 U.S.C. § 3732(a) provides that "[a]ny action under section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred."   At all times relevant to this action, up to and including the date of this filing, Defendants have transacted business in the State of Florida and in the Southern District of Florida, as more particularly described herein.

8.      Further, one or more of the Defendants submit claims for Medicare reimbursement to a Medicare Administrative Contractor, First Coast Service Options, Inc., which is located in Florida.

9.     The facts and circumstances which give rise to Defendants' violations of the False Claims Act have not been publicly disclosed in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party, nor in any congressional, administrative, or General Accounting Office or other federal report, hearing, audit, or investigation; nor in the news media.

10.     Relator is the "original source" of the information upon which this complaint is based, as that term is used in the False Claims Act and other laws at issue herein.

11.     Should there have been a public disclosure of any aspect of these allegations prior to the filing of this action, Relator has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions.

### III. PARTIES

#### A. Plaintiff

12.     The United States of America is the real party in interest to the claims advanced in this Complaint, as Medicare is a federally funded program to which the Defendants have submitted false claims.

13.     Relator, Kenneth Morse, CMD, is a United States citizen and resident of the State of Louisiana.  He brings this action on his own behalf and on behalf of the United States pursuant to 31 U.S.C. § 3730(b)(1).

14.     Mr. Morse was employed by Sensus Healthcare, Inc. ("Sensus Healthcare") as Vice President of Clinical Research and Development and Radiation Safety Officer from September 2011 to January 2018.

15.     Sensus Healthcare is a publicly traded company which manufactures and distributes medical devices, with its principal place of business in Boca Raton, Florida.

16.     Mr. Morse's duties at Sensus Healthcare included overseeing the clinical applications division, collecting data from previous applications of non-melanoma skin cancer and keloids, producing research papers for physician review, and developing new treatment protocols for skin lesions.  Mr. Morse was directly involved in Sensus Healthcare's relationship with Centers for Medicare & Medicaid Services ("CMS") and the implementation of CPT billing codes for medical billing and superficial radiation therapy.

17.     Mr. Morse is a veteran of the United States Air Force, and has thirty years of progressive experience in all phases of medical dosimetry, including IMRT, 3D planning, and brachytherapy. Mr. Morse also trained staff members on clinical procedures, protocols, planning techniques as an Applications Specialist with electronic brachytherapy.

18.     Mr. Morse is nationally licensed in Medical Dosimetry, Radiation Therapy, and as a Radiologic Technician. Mr. Morse is also a member of the Medical Dosimetrist Certification Board, American Association of Medical Dosimetrists, and the American Society of Radiologic Technologists.  And, Mr. Morse conducts research, regularly presents on topics in his field, and has been published on a number of topics.

19.     Through his employment with Sensus Healthcare, Mr. Morse became knowledgeable about the billing procedures of the Defendants, who purchased medical devices from Sensus Healthcare, as described below.

20.     The medical devices which the Defendants purchase from Sensus Healthcare were used as part of the Defendants' scheme to make false claims against the United States.

### B. Defendants

21.     Defendant SkinCure Oncology LLC ("SkinCure") is a Delaware corporation registered to do business in the State of Florida.  SkinCure operates across the country and markets

4

a turnkey model for the delivery of Superficial Radiation Therapy ("SRT") for the treatment of non-melanoma skin cancers using image guided superficial radiation therapy systems.

22.     SkinCure has relationships with, and provides medical billing for, in excess of 37 treatment centers nationwide, including centers in Florida, Alabama, Louisiana, Georgia, California, Illinois, Indiana, Kansas, Mississippi, Missouri, Michigan, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Texas.

23.     Dr. Daniel Ladd is the chief medical officer of SkinCure.

24.     Defendant, Tru-Skin Dermatology, upon information and belief, is operated in whole or in part by Tru-Skin Franchise Development, LLC, a Texas limited liability company and one or more other entities ("Tru-Skin").  Tru-Skin operates six treatment centers in Texas and was founded by Dr. Daniel Ladd.

25.     Defendants, John Doe 1 through 50, have identities unknown to the Relator at this time, however, are individuals and entities through which the Defendants conduct their business from several locations and make false claims as described herein.

## IV.  FEDERAL RULE OF CIVIL PROCEDURE 9(b) ALLEGATIONS

26.     Much of the documentary evidence necessary to prove the allegations in this Complaint is in the exclusive possession of either the Defendants or the United States.

27.     With respect to each allegation herein made upon information and belief, Relator has, based upon his knowledge, data, and experience, a reasoned factual basis to make the allegation but in some cases lacks complete details of it.

28.     Relator is familiar with Defendants' internal structures, policies, and procedures as a result of his relationship with Defendants and personally observed the practices alleged herein.

29.     Relator, however, does not have access to all of the data or documents regarding the claims for payment submitted or caused to be submitted by Defendants.  This information is in Defendants' exclusive possession and control.

30.     Relator has personal knowledge that Defendants knowingly submitted and caused to be submitted and, upon information and belief, continue to submit or cause to be submitted to the United States false claims for payment of medical services with the full knowledge that the services rendered were in violation of federal Medicare laws and otherwise failed to meet the conditions for coverage and payment required.

31.     Upon information and belief, Relator alleges that Defendants' fraudulent scheme has occurred continuously since the practices began as detailed below.


V.      **GENERAL ALLEGATIONS**

32.     The SRT-100 unit is a medical device manufactured by Sensus Healthcare and costs approximately $224,000.  The unit performs Superficial Radiation Therapy ("SRT"), a non-invasive treatment for non-melanoma skin cancer and keloids.

33.     Sensus Healthcare also manufactures a device called the SRT-100 Vision which had an initial sales price exceeding $500,000.  The only difference between the SRT-100 and the SRT-100 Vision is that the vision unit contains an ultrasound component.

34.     The SRT-100 Vision unit was intended for use by radiation oncologists and has a higher price over the SRT-100 unit because medical billing reimbursement rates were much higher for cancer centers, which were the intended market for the device.  The SRT-100 Vision units, however, historically did not sell well, as the economics of the medical reimbursements did not support the high cost and expenses of the unit.

35.     The typical billing reimbursement for SRT in the dermatology context is approximately $1,800 to $1,900 dollars per patient, per lesion; however, physicians could not afford to operate their practices using a SRT-100 Vision when they were being reimbursed less than $2,000 per patient.

36.     In 2015, Tru-Skin Dermatology operated one or more dermatology treatment centers and owned one SRT-100 unit and no SRT-100 Vision units.

37.     However, in the second quarter of 2015 Tru-Skin began purchasing SRT-100 Vision units from Sensus Healthcare.

38.     These purchases of SRT-100 Vision units were possible because the Defendants determined that physician practice could be profitable if the billing reimbursement for SRT exceeded $10,000 per patient.

39.     Accordingly, Tru-Skin, and its six treatment centers, were formed to test a model for Medicare billing to support $10,000 per patient in reimbursements.

40.     Accordingly, despite the known poor economics of the use of the SRT-100 Vision units in the context of dermatological SRT, in 2015, Tru-Skin, under Dr. Ladd's leadership, purchased multiple SRT-100 Vision units from Sensus Healthcare.  To date, Tru-Skin has purchased at least six SRT-100 Vision units.  Tru-Skin is the only Dermatologist practice in the country with so many SRT-100 Vision units.

41.     After Tru-Skin had been billing Medicare in the manner and at the rates described herein, and upon a determination that the scheme could work, SkinCure was created to exponentially expand the Tru-Skin business model.

42.     In 2017, Sensus Healthcare entered into a contract with SkinCure pursuant to which SkinCure would purchase a total of 46 SRT-100 Vision devices manufactured by Sensus

7

Healthcare. At the time, no other dermatology groups were purchasing the $500,000 SRT-100 Vision.

43.     SkinCure markets and operates a "turn key" operation, which provides physicians with staff and SRT-100 Vision devices, and handles all of the medical billing for the physicians.

44.     SkinCure Oncology's website boasts that it is:

> a one-stop turnkey solution. We provide the capital needed to get started. We cover the acquisition costs of treatment units and the costs associated with the SRT service line. It's a risk-free model for the dermatology practice.

45.     Indeed, SkinCure states that in certain cases, a physician's practice can start seeing patients with its SRT services in as little as 45 days.

46.     When a dermatologist enters into a contract with SkinCure, they agree to let SkinCure perform the physician's Current Procedural Terminology ("CPT") code billing. The entire billing process is handled by SkinCure at a centralized location under the guise of the convenience offered to the physician by SkinCure. The dermatologist does not know the details of what is being billed on his or her behalf. In fact, the physicians do not review the billing performed by SkinCure, and only see the total amount billed. In short, the doctors provide their billing credentials to Skin Cure, which performs the billing on a day-to-day basis, and Skin Cure takes their cut of the Medicare reimbursement and provides the remaining funds to the dermatologist facility.

## VI. STATUTORY AND REGULATORY ENVIRONMENT

### A. Federal False Claims Acts

47.     Relator brings this action under the FCA on behalf of the United States to recover damages and civil monetary penalties from the Defendants for the fraudulent conduct detailed herein. The FCA is the primary law on which the federal government relies to recover losses

8

caused by fraud. *McNutt ex rel. United States v. Haleyville Med. Supplies,* 423 F.3d 1256 (11th Cir. 2005).

48.     The FCA provides that any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval, or knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim, or those who knowingly conceal, improperly avoid or decrease an obligation to pay money to the government is liable for a civil penalty ranging from $5,500 up to $11,000 for each such claim as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 note; Public Law 104-410), plus three times the amount of the damages sustained by the Government. 31 U.S.C. §§ 3729(a).

49.     The FCA also prohibits conspiring to violate the statute's substantive provisions. 31 U.S.C. § 3729(a)(1)(C).

50.     A "claim" means any request or demand for money or property provided by the Government under one of its programs, such as Medicare. 31 U.S.C. §§ 3729(b)(2). Claims made to the states are actionable if the Government will reimburse the state for any portion of the claim. 31 U.S.C. § 3729(b)(2)(A).

51.     The FCA allows any person having information about false or fraudulent claims to bring an action for himself and the Government, and to share in any recovery. Based on these provisions, Relator seeks through this action to recover on behalf of the United States and himself all available damages, civil penalties, and other relief for the violations alleged herein.

52.     This action is not subject to 31 U.S.C. § 3730(b)(5)'s first-to-file restriction because the false claims allegations in this Complaint are not based on the facts underlying a pending FCA action. Likewise, this action is not subject to 31 U.S.C. § 3730(e)(4)(A)'s public disclosure

limitations because the allegations and transactions in this action have not been publicly disclosed (1) in a federal criminal, civil, or administrative hearing in which the government or its agent is a party, (2) in a congressional, Government Accountability Office, or other federal report, hearing, audit, or investigation, or (3) through the news media. Moreover, if there has been a prior public disclosure of any of the allegations or transactions alleged in this action through one of the above-referenced categories of proceedings or sources, Relator qualifies as an "original source" of such information, pursuant to 31 U.S.C. § 3730(e)(4)(B).

### B. FCA's History, Purpose, and Provisions

53.     Originally enacted in 1863 in response to widespread corruption, fraud, and misuse of federal funds during the Civil War, the FCA was weakened by a 1943 amendment which considerably decreased the statute's application and the frequency of its use. *See* 132 CONG. REC. H6474 (Sept. 9, 1986) (statement of Rep. Glickman). However, in response to a wave of procurement scandals in the mid-1980s, Congress substantially amended the FCA in 1986 to provide more effective means of identifying, stopping, and remedying fraud against the government. *Id.* Among other things, the 1986 amendments (1) reduced the burden of proof (to a preponderance standard), 31 U.S.C. § 3731 (d); (2) lowered the *mens rea* requirement (reducing it to reckless disregard of the truth or falsity of the submitted claim), § 3729(b)(1)(A); (3) increased the available damages and penalties (imposing treble damages and civil monetary penalties), § 3729(a); and (4) extended the statute of limitations (providing between 6 and 10 years to file an action),§ 3731(b). *See generally,* Pub. L. 99-562, 100 Stat. 3153 (1986); Pub L. 103-272, 108 Stat. 1362 (1994). The FCA was further strengthened in 2009 and 2010 to clarify the statute's application to false claims submitted by private contractors working on government projects and

limit the scope and effects of the statute's public disclosure bar. *See* Fraud Enforcement and Recovery Act, Pub. L. No. 111-21, 123 Stat. 1617 (2009) (amending 31 U.S.C. §§ 3729-3733); Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010) (amending 31 U.S.C. § 3730(e)(4)).

54.    The 1986 FCA amendments also increased the incentives for private whistleblowers to invest their own time and resources into uncovering, reporting, and pursuing FCA violations. Under certain circumstances, these whistleblowers (known as "relators") may bring civil FCA actions (known as "*qui tam*" suits) on behalf of the United States to recover damages and penalties. *See* 31 U.S.C. § 3730(b). Relators who bring successful *qui tam* actions may receive a percentage (normally between 15%-30%) of the government's recovery.

### C.  FCA *Qui Tam* Suits Have Recovered Billions Stolen from the United States and Federal Health Care Programs

55.    Since the FCA's 1986 amendments became effective, private *qui tam* actions have comprised a sizable majority of new FCA matters (including referrals, investigations, and filed cases) reported by the United States Department of Justice. More particularly, *qui tam* actions comprised 62.2% of all new FCA matters (6,628 out of 10,650 matters) between October 1, 1986 and September 30, 2009. During the same period, *qui tam* actions were responsible for an even higher percentage of overall FCA recoveries through judgments or settlements, accounting for 65.1% of all FCA damages and penalties recovered from defendants ($15,658,403,837 out of $24,056,382,238).

56.    *Qui tam* actions have been particularly effective in identifying fraud against the government in the health care industry.  In FCA health care cases (like this action) brought during the same 23-year period, *qui tam* actions and recoveries comprised even larger shares of all claims brought, 84.4% of all the new FCA matters reported by the Department of Health and Human

Services (3,587 out of 4,248 matters) and judgments/settlements paid by defendants, 72.2% of all the recoveries from FCA defendants in health care cases ($11,506,614,307 out of $15,943,495,594).

### VII.  THE MEDICARE STATUTES (42 U.S.C. §§ 1395-1395ccc)

#### A. The Medicare Program  (Defendants Submit Claims Under Medicare)

57.    The Medicare program was created through 1965 amendments to the Social Security Act, which added Title XVIII (Medicare) to the Act. Pub. L. No. 89-97, 79 Stat. 286 (1965).  In 2017, the Medicare program provided health insurance to approximately 58 million Americans, and the federal government's gross spending on the program was estimated to total more than $700 billion. *See* Cong. Budget Office, The Long-Term Budget Outlook at 15 (2017) (available at https://www.cbo.gov/system/files/115th-congress-2017-2018/reports/52480-ltbo.pdf) (hereinafter "CBO") and HHS FY 2017 Budget in Brief - CMS – Medicare (available at https://www.hhs.gov/about/budget/fy2017/budget-in-brief/cms/medicare/index.html).      The Congressional Budget Office projects that federal outlays for these programs will increase year to year.

58.    Medicare is a federally funded and federally administered nationwide social health insurance system for Americans age 65 and older, and for younger adults with permanent disabilities. In 2016, the Medicare program covered 56.8 million Americans (47.8 million elderly and disabled Americans) and paid $669.5 billion in benefits, *see* Bd. of Trs. of the Fed. Hosp. Ins. and Fed. Supplementary Med. Ins. Trust Funds, 2017 Annual Report at 7, 10 (2017) (available at https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/ReportsTrustFunds/Downloads/TR2017.pdf).

12

59.     The Medicare program contains 4 main components: Parts A, B, C, and D.  Upon information and belief, the Defendants submit claims under all parts of Medicare.

60.     Defendants submit Medicare claims to Medicare Administrative Contractors for the services provided by its client practices.

### B.  Coding Requirements – The Importance of Diagnosis and Procedure Codes

61.     Medicare requires claims for reimbursement to contain truthful and accurate diagnosis and procedure codes. Among other uses, these codes are vital to Medicare's ability enforce its coverage rules.  Medicare Part B provides a representative example of the program's reliance on truthful and accurate diagnosis and procedure coding to effectuate its coverage limitations. While Part B pays for a broad range of medical treatments, it only covers medical care that is "reasonable and necessary for the diagnosis or treatment of injury or illness ...." 42 U.S.C. § 1395y(a)(l)(A). As a result, under Part B, all coverage for any medical procedure is limited to specific diagnoses that a particular procedure is known to treat.  Moreover, as a means of controlling program costs, Medicare Part B has adopted detailed rules excluding coverage for specific categories of medical care unless it is provided to treat particular diagnoses (*e.g.,* cosmetic surgery is excluded unless it is undertaken to correct damage from an accidental injury). Given the centrality of both procedure and diagnosis information to Part B's coverage regime, the program understandably requires and expects that all claims submitted by providers will contain truthful and accurate procedure and diagnosis codes.

### C.  Requirement of Accurate Diagnosis and Procedure Codes

62.     In order to implement Medicare's coverage restrictions, all claims for physician services since 1989 have had to include "appropriate diagnostic coding for those services using

13

ICD-9-CM," which is a standardized set of diagnosis codes formally known as the *International Classification of Diseases,* Ninth Edition, Clinical Modification. *See* 42 C.P.R. § 424.32(a)(2); *see also* 42 U.S.C. § 1395u(p)(l). Pursuant to this requirement, physicians submitting Medicare claims are expected to "[a]ssign an ICD-9-CM code that provides the highest degree of accuracy and completeness." CMS Program Memorandum, Tr. B-03-046, p.3 (Jun. 10, 2003) (available at http://www.cms.gov/Transmittals/Downloads/b03046.pdf).

63.    The Medicare program similarly requires that all claims identify medical services with a standardized set of procedure codes known as the *Current Procedure Terminology* (CPT codes). 45 C.P.R. §162.1002(c)(l). CPT codes comprise a subset of Medicare's *Healthcare Common Procedure Coding System* (HCPCS codes), which also includes non-CPT codes for medical products and supplies.  Physicians request reimbursement from Medicare for each service provided to patients and identify the services provided according to the HCPCS codes.  HCPCS codes correlate to Medicare's Physician Fee Schedule and thereby control the amount of Medicare reimbursement received for the care provided.

64.    Before Medicare will pay a claim pursuant to its Physician Fee Schedule, it determines whether the ICD-9-CM diagnosis code and the HCPCS procedure code on the claim correlate, meaning that the listed procedure is a covered treatment for the identified diagnosis. This dual assessment of both the ICD-9-CM and HCPCS codes is one of the chief mechanisms by which the Medicare program enforces its coverage restrictions.

65.    Because ICD-9-CM diagnosis codes and HCPCS procedure codes are used to determine whether specific services are covered by the Medicare program, use of truthful and accurate diagnosis codes on Part B claims is a condition of Medicare payment for those services. *See, e.g.,* 42 U.S.C. § 1395u(p)(1) (conditioning payment on use of "appropriate diagnosis codes").

14

66.    The importance of truthful coding is further emphasized by Part B's claim form itself. Medicare Part B claims are submitted on Form CMS 1500 or its electronic equivalent, which requires physicians to certify that the information provided on the claim "is true, accurate and complete," and "that the services listed" on the claim "were medically indicated and necessary to the health of the patient." 42 U.S.C. §1395w-4(g)(4)(A)(i); 42 C.P.R.§ 424.32(b), (d); *see also* CMS 1500 form (available at https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/downloads/cms1500805.pdf).

## VIII.    DEFENDANTS' KNOWING SUBMISSION OF FALSE CLAIMS

67.    Since at least 2015, the Defendants have defrauded the Medicare program by submitting billing claims for services that were not medically indicated and necessary to the health of the patient, by billing for services which they could not have performed, and by billing for services that were not performed.  These actions were taken for the purposes of maximizing the Defendants' revenue and not for the health of the patients.

68.    Sensus Healthcare's two Superficial Radiation Therapy ("SRT") units, the SRT-100 and the SRT-100 Vision, each utilize the same type of energy, and the highest energy output for each unit is 100 Kilovolts (kV).[1]

69.    A listing of the standard CTP codes used for SRT is as follows:[2]

**1 Lesion (New Patient)**

99203 Office/Outpatient visit new, Modifier 25
77290 Complex Simulation (Professional Comp., Tech comp.)

---

[1] The SRT-100 Vision software is higher tech but does not do special dosimetry (measurement of dose to patients) or physics.

[2] Fractionation schemes are based upon 13 fractions (therapy sessions).  The Defendants, however, base their billing on 20 fractions.

77300 Basic Dosimetry Calculation 1(Professional Comp., Tech Comp.)
77401 Superficial Treatment 13 FX units
99213 Office/ Outpatient visit established (performed each FX with modifier 25) 13 units

**1 Lesion (Established Patient)**

99213 Office/Outpatient visit new, Modifier 25
77290 Complex Simulation (Professional Comp., Tech comp.)
77300 Basic Dosimetry Calculation 1(Professional Comp., Tech Comp.)
77401 Superficial Treatment 13 FX units
99213 Office/ Outpatient visit established (performed each FX with modifier 25) 13 units

**2 Lesion (New Patient)**

99203 Office/Outpatient visit new, Modifier 25
77290 Complex Simulation (Professional Comp., Tech comp.)
77300 Basic Dosimetry Calculation 2 (Professional Comp., Tech Comp.)
77401 Superficial Treatment 13 FX units
99213 Office/ Outpatient visit established (performed each FX with modifier 25) 13 units

**2 Lesion (Established Patient)**

99213 Office/Outpatient visit new, Modifier 25
77290 Complex Simulation (Professional Comp., Tech comp.)
77300 Basic Dosimetry Calculation 2 (Professional Comp., Tech Comp.)
77401 Superficial Treatment 13 FX units
99213 Office/ Outpatient visit established (performed each FX with modifier 25) 13 units

**3 Lesion (New Patient)**

99203 Office/Outpatient visit new, Modifier 25
77290 Complex Simulation (Professional Comp., Tech comp.)
77300 Basic Dosimetry Calculation 3 (Professional Comp., Tech Comp.)
77401 Superficial Treatment 13 FX units
99213 Office/ Outpatient visit established (performed each FX with modifier 25) 13 units

**3 Lesion (Established Patient)**

99213 Office/Outpatient visit new, Modifier 25
77290 Complex Simulation (Professional Comp., Tech comp.)
77300 Basic Dosimetry Calculation 3 (Professional Comp., Tech Comp.)
77401 Superficial Treatment 13 FX units
99213 Office/ Outpatient visit established (performed each FX with modifier 25) 13 units

70.     The foregoing CPT codes are largely consistent and not many adjustments may be made. Indeed, very few codes can be added or duplicated, and there are few variations.[3]

71.     Proper billing for superficial radiation therapy is around $1,800 to $1,900 per patient, per lesion for six weeks of treatment, and is standard nationwide.

72.     And, when billed properly, whether the SRT-100 or the SRT-100 Vision is used, there could only be a potential of approximately $600 difference in reimbursement.

73.     In total, the highest amount which could be charged within the CMS guidelines for SRT is between $2,200 and $2,400.

### A. Defendants Have Defrauded the Medicare Program Through Their Billing Practices

74.     Relator has witnessed the Defendants' billing policies and procedures and personally knows that Defendants improperly billed and submitted claims to Medicare in the manner set forth herein.

75.     Typically, when Sensus Healthcare delivers an SRT-100 Vision machine to a care center, Sensus Healthcare employees demonstrate the use of the machine and its functions, and discuss proper billing, physics, and radiation biology with the care center's employees.

76.     When the Defendants purchase the SRT-100 Vision machines from Sensus Healthcare, however, the Sensus Healthcare employees are prohibited from discussing billing,

---

[3] Some common variations include:

(New Patient: 99203 or Established Patient: 99213) Office or other outpatient visit for the evaluation and management of a new patient
77300 = for a calculation
77280 = may be used for a clinical adjustment in setup, but not to be used daily.

physics, or radiation biology with the Defendants' care center's employees.  Instead, the Sensus

Healthcare employees are limited to demonstrating use of the machine and its functions.

77.     Through the foregoing actions the care center employees were kept from

discovering that SkinCure's billing model was improper.   And, because SkinCure handles all of

the billing for the care centers, there is no need for the employees to be familiar with the proper

billing methods.


**B.  The Defendants Billed for Codes Inapplicable to the SRT-100's Energy Level**

78.     Because the SRT units only go up to 100 kV, the applicable CPT code manuals

dictate that the following codes cannot be used in SRT:

      a.  77261 ($94.32) Therapeutic radiology treatment planning; simple

      b.  77262 ($114.57) Therapeutic radiology treatment planning; Intermediate

      c.  77334 ($154.32) Treatment devices, design and construction

      d.  77427 ($187.61) Radiation Treatment Management

79.      Indeed, the 2015 CPT code manual on page 437 provides:

18

Energies below the megavoltage range may be used in the treatment of skin lesions. Superficial radiation energies (up to 200 kV) may be generated by a variety of technologies and should not be reported with megavoltage (77402, 77407, 77412) for surface application. Do not report clinical treatment planning (77261, 77262, 77263), treatment devices (77332, 77333, 77334), isodose planning (77306, 77307, 77316, 77317, 77318), physics consultation (77336), or radiation treatment management (77427, 77431, 77432, 77435, 77469, 77470, 77499) with 77401. When reporting 77401 alone, physician evaluation and management, when performed, may be reported with the appropriate E/M codes.

80.    The Defendants, however, are billing under codes 77261, 77262, 77334 and 77427 with the SRT-100 units which do not operate above 100 kV. The Defendants are then being reimbursed by Medicare for these codes because the Medicare Administrative Contractors ("MAC") do not know the energy level being used in the SRT procedures and, therefore, do not notice the Defendants' improper billing.[4]

### C. Defendants Billed for Codes for Duplicative Simulations and Inapplicable Procedures

81.    The Defendants are billing the following simulation CPT codes: 77280, 77285, 77290.

82.    A simulation is a process of setting a patient up for radiation treatment. It should be performed <u>one time only</u> during the initial patient set up and treatment planning, and not

---

[4] A Medicare Administrative Contractor (MAC) is a private health care insurer that has been awarded a geographic jurisdiction to process Medicare medical claims.

multiple times throughout the treatment; however, the Defendants bill these codes for each of the 20 treatment sessions per patient, certifying that work was performed which was not.

83.    Specifically, as to the following codes:

    a.  77280 (Therapeutic radiology simulation-aided field setting, simple): This is a simple setup code for one lesion and should be used one time throughout the entire SRT treatment scheme unless warranted by biological clinical changes per the physician.  This simulation code is not used in connection with ultrasound procedures; however, the Defendants are billing it for those improper purposes.

    b.  77285 (Intermediate Simulation): Should be used one time with SRT, but cannot be used together with 77290 on the same patient protocol.

    c.  77290 (Complex Simulation): Should be used one time with SRT, but cannot be used together with 77285 on the same patient protocol.

84.    Also, the Defendants are improperly billing under code G6001 (ultrasonic guidance for placement of radiation therapy fields) for localizing lesions.  G6001, however, is not used for lesion evaluations but should be used as an ultrasonic guidance for placement of radiation therapy fields.  And, along with code 77280 (above), the Defendants are billing this code each time they perform a patient's treatment.  Both of these treatments and these codes, however, should not be used, especially each time a patient receives a dose from the machine.

85.    And, the SRT-100 Vision unit should not be used in connection with billing code G6001 because the ultrasound component of the SRT-100 Vision unit produces pixels which are too big, such that the user cannot discern the patient's skin from a skin lesion.  In short, because of poor image quality, and the Defendants' lack of properly trained personnel to interpret the

images, the device cannot be used for the purpose for which the Defendants are billing Medicare under code G6001.

86.     Defendants also improperly bill under the following codes:

   a.   77295 (3-dimensional radiotherapy plan, including dose-volume histogram). The SRT-100 Vision device simply does not perform this function, and this code should never be used for SRT because SRT does not require the performance of a 3-dimensional radiotherapy plan, including dose-volume histogram (a graphic display of dosage in a patient). This is only performed by cancer centers with megavoltage accelerator devices, where computerized tomography data is performed which demonstrates a significant change in patient anatomy and/or delineated tumor volumes – which is not done in SRT. To be used, the code requires a treatment planning system (a device which costs approximately $500,000) and daily support from a physicist, of which the Defendants have neither.

   b.   77306 (Teletherapy, isodose plan; simple - 1 or 2 unmodified ports directed to a single area of interest).  The Defendants are improperly billing this code for the same reasons as set forth in relation to 77295, above.

87.     Defendants also improperly bill under the following codes:

   a.   77331: This should not be used because the SRT-100 Vision unit is not capable of performing this task, and the applicable energy level used is too low to receive an accurate reading.  This procedure is not to be routinely performed each time the patient is treated and should be reported only under special

circumstances when the physician orders it.[5]  Defendants, however, modified the SRT units to imitate the reading required to use this code, despite the fact that the device does not perform this function, and are billing this code twenty times per patient, at a rate of $64.45 per instance.

b.  77336 (continuing physics support): This code is for Continuing medical physics consultation – commonly called "weekly physics" – including assessment of treatment parameters, quality assurance of dose delivery, and review of patient treatment documentation in support of the prescription, reported once per each 5 fractions of therapy. It is billed for the quality assurance of dose delivery from the machine or source, as well as review of the charts and documentation of dosimetry plans, calculations and other items such elapsed days and other entries within the patient's chart. Essentially, the continuing medical physics service assures the physician's prescription and intent is delivered accurately.  A physicist must perform this code and must be on site and it cannot be done remotely.  Defendants are billing such services under code 77336, but they are not performing such services.  Indeed, in order to perform such services at the frequency for which they are billing it, the Defendants would have to hire several physicists to fly all around the country weekly.  And, the Defendants are not doing that.

---

[5] The code is used to report the measurement of radiation dose at a given point using radiation monitoring and measuring devices such as thermoluminescent dosimeters, various types of dosimetry probes, or film dosimetry. The results of the measurements are utilized to either accept or revise the current treatment plan.

88.     Utilizing the above-detailed billing codes, the Defendants are able to reach the following total claim amounts per-patient, per lesion treated in fraudulent coding and billing:

77262= $114.57

77280= $276.05 x 20= $5,521.00

77334= $154.32

77427= $187.61

G6001= $52.27 x 25= $1,306.75

77336= $80.20 x 4= $320.80

77331= $64.45 x 20= $1,289.00

Total Billing to Medicare per patient, per lesion = $10,739.37.[6]

89.     Also, the Defendants require many patients to be treated four days per week without regard to whether such frequency is necessary.  And, the Defendants require many patients to return to the care center a fifth day per week for an ultrasound without regard to whether such an ultrasound is necessary.

90.     In addition to improperly billing in excess of $8,000 per lesion, based upon national averages, typical patients treated by the Defendants have 2.5 lesions.  Accordingly, typically the Defendants have improperly billed in excess of $20,000 per patient.

91.     It is estimated that each of the Defendants' approximately thirty-seven treatment centers are performing this fraudulent procedure on 220 patients per year.  Accordingly, the Defendants' false claims exceed $160,000,000.

---

[6] Sensus Healthcare operates its own care centers, using the same machines as the Defendants, and is only able to properly bill $1,800 to $1,900 per patient per lesion.

92.     And, aside from the fraud perpetrated upon the government, this scheme results in higher copays for the patients, and submission to unnecessary medical treatments.

93.     In sum, the Defendants' have knowingly, repeatedly, and systematically violated material conditions of payment, compliance with which was necessary to entitle them to receive payments from Medicare.  Those payments consisted of federal funds, and the claims for those payments, by virtue of Defendants' knowing noncompliance with conditions of payment alleged herein, violated the federal False Claims Act.

### Count I - Violation of False Claims Act - 31 U.S.C. § 3729(a)(1)
### (SkinCure Oncology, LLC)

94.     The allegations of the paragraphs 1through 93, above, are incorporated as if fully alleged herein.

95.     The False Claims Act, 31 U.S.C. § 3729(a)(1)(A) and (B) imposes liability upon, *inter alia*, those who knowingly cause to be presented false claims for payment or approval, and those who make or use, or cause to be made or used, false records or statements material to a false claim or to an obligation to pay money to the government.

96.     Claims for payment to Medicare which resulted from the Defendants' conduct described above are false claims.

97.     Defendant knowingly presented or caused to be presented, false or fraudulent claims for payment or approval to the United States including improper claims for superficial radiation therapy services they did not provide in violation of 31 U.S.C. § 3729(a)(1)(A).

98.     Defendant's actions in knowingly presenting or causing to be presented false claims for Medicare payments for superficial radiation therapy services were done knowingly as that term is defined by the False Claims Act, 31 U.S.C. § 3729(b)(1)(A)(i-iii),  and § 3729(b)(1)(8).

99.     In furtherance of these schemes, Defendant also knowingly made, used or caused to be made or used, false records and statements material to a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(1)(8).

100.     In violation of 31 U.S.C. § 3729(a)(1)(8), Defendant knowingly created and used, or caused to be made or used, false billing records that reflected otherwise inappropriate charges as described above.

101.     Defendant's actions in knowingly creating and using, or causing to be made or used, false or fraudulent documents were done knowingly as that term is defined by the False Claims Act, 31 U.S.C. § 3729(b)(1)(A)(i-iii),  and § 3729(b)(1)(8).

102.     In violation of 31 U.S.C. § 3729(a)(1)(C), Defendants conspired to defraud the government by getting the false or fraudulent claims allowed and paid.

103.     By virtue of the false or fraudulent claims made or caused to be made by the Defendant, the Defendant's actions would have had a natural tendency to affect the United States' decision to pay claims.  As a result, the United States has suffered damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

### Count II -Violation of False Claims Act - 31 U.S.C. § 3729(a)(1)
### (Tru-Skin Dermatology)

104.     The allegations of the paragraphs 1 through 93, above, are incorporated as if fully alleged herein

105.     The False Claims Act, 31 U.S.C. § 3729(a)(1)(A) and (B) imposes liability upon, *inter alia*, those who knowingly cause to be presented false claims for payment or approval, and

those who make or use, or cause to be made or used, false records or statements material to a false claim or to an obligation to pay money to the government.

106.    Claims for payment to Medicare which resulted from the Defendants' conduct described above are false claims.

107.    Defendant knowingly presented or caused to be presented, false or fraudulent claims for payment or approval to the United States including improper claims for superficial radiation therapy services they did not provide in violation of 31 U.S.C. § 3729(a)(1)(A).

108.    Defendant's actions in knowingly presenting or causing to be presented false claims for Medicare payments for superficial radiation therapy services were done knowingly as that term is defined by the False Claims Act, 31 U.S.C. § 3729(b)(1)(A)(i-iii), and § 3729(b)(1)(8).

109.    In furtherance of these schemes, Defendant also knowingly made, used or caused to be made or used, false records and statements material to a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(1)(8).

110.    In violation of 31 U.S.C. § 3729(a)(1)(8), Defendant knowingly created and used, or caused to be made or used, false billing records that reflected otherwise inappropriate charges as described above.

111.    Defendant's actions in knowingly creating and using, or causing to be made or used, false or fraudulent documents were done knowingly as that term is defined by the False Claims Act, 31 U.S.C. § 3729(b)(1)(A)(i-iii), and § 3729(b)(1)(8).

112.    In violation of 31 U.S.C. § 3729(a)(1)(C), Defendants conspired to defraud the government by getting the false or fraudulent claims allowed and paid.

113.    By virtue of the false or fraudulent claims made or caused to be made by the Defendant, the Defendant's actions would have had a natural tendency to affect the United States'

decision to pay claims.  As a result, the United States has suffered damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

### Count III - Violation of False Claims Act - 31 U.S.C. § 3729(a)(1)
### (John Does 1 through 50)

114.    The allegations of the paragraphs 1 through 93, above, are incorporated as if fully alleged herein

115.    The False Claims Act, 31 U.S.C. § 3729(a)(1)(A) and (B) imposes liability upon, *inter alia*, those who knowingly cause to be presented false claims for payment or approval, and those who make or use, or cause to be made or used, false records or statements material to a false claim or to an obligation to pay money to the government.

116.    Claims for payment to Medicare which resulted from the Defendants' conduct described above are false claims.

117.    Defendants knowingly presented or caused to be presented, false or fraudulent claims for payment or approval to the United States including improper claims for superficial radiation therapy services they did not provide in violation of 31 U.S.C. § 3729(a)(1)(A).

118.    Defendants' actions in knowingly presenting or causing to be presented false claims for Medicare payments for superficial radiation therapy services were done knowingly as that term is defined by the False Claims Act, 31 U.S.C. § 3729(b)(1)(A)(i-iii),  and § 3729(b)(1)(8).

119.    In furtherance of these schemes, Defendants also knowingly made, used or caused to be made or used, false records and statements material to a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(1)(8).

120.    In violation of 31 U.S.C. § 3729(a)(1)(8), Defendants knowingly created and used, or caused to be made or used, false billing records that reflected otherwise inappropriate charges as described above.

121.    Defendants' actions in knowingly creating and using, or causing to be made or used, false or fraudulent documents were done knowingly as that term is defined by the False Claims Act, 31 U.S.C. § 3729(b)(1)(A)(i-iii),  and § 3729(b)(1)(8).

122.    In violation of 31 U.S.C. § 3729(a)(1)(C), Defendants conspired to defraud the government by getting the false or fraudulent claims allowed and paid.

123.    By virtue of the false or fraudulent claims made or caused to be made by the Defendants, the Defendants' actions would have had a natural tendency to affect the United States' decision to pay claims.  As a result, the United States has suffered damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

WHEREFORE, Relator requests:

A.    That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States Government has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each action in violation of 31 U.S.C. § 3729, and the costs of this action, with interest, including the costs to the United States Government for its expenses related to this action;

B.    That in the event that United States Government continues to proceed with this action, Relator be awarded an amount for bringing this action of 25% of the proceeds of the action or the settlement of any such claim;

28

C.     That in the event that the United States Government does not proceed with this action, Relator be awarded an amount for collecting the civil penalty and damages of 30% of the proceeds of this action or the settlement of any such claim;

D.     That Relator be awarded all costs, attorneys' fees, and litigation expenses; and

E.     That the United States Government and Relator receive all relief, both at law and in equity, to which they may reasonably be entitled.

Dated: March 23, 2018.

Respectfully submitted,

Russell Landy
rlandy@dvllp.com
Florida Bar No. 0044417
Peter F. Valori, Esq.
pvalori@dvllp.com
Florida Bar No. 0043516
DAMIAN & VALORI LLP
1000 Brickell Avenue, Suite 1020
Miami, Florida 33131
Telephone: (305) 371-3960
Facsimile: (305) 371-3965
*Attorneys for Relator*